| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-2(c) **GENOVA BURNS, LLC** 110 Allen Road, Ste. 304 Basking Ridge, New Jersey 07920 Phone: (973) 533-0777 Fax: (973) 533-1112 *Counsel to Affiliated Physicians and Employers Master Trust* **DANIEL M. STOLZ, ESQ.** **DONALD W. CLARKE, ESQ.** | |
| **In Re:** **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBERS HEALTH PLAN NJ,** **Debtor.** | Case No.:  21-14286(MBK) Judge: Honorable Michael B. Kaplan Chapter: 11 |
| **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBERS HEALTH PLAN NJ,** Plaintiff, v. **AETNA LIFE INSURANCE COMPANY AND AFFILIATED ENTITIES,** Defendants. | Adv. Pro. No.: 21-_____ (MBK) |

### APPLICATION IN SUPPORT OF THE DEBTOR'S APPLICATION FOR TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF

Debtor Affiliated Physicians and Employers Master Trust d/b/a Members Health Plan NJ, (hereinafter "APEMT" or the "Debtor"), the debtor-in-possession of its bankruptcy estate, and plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by and through their counsel, Genova Burns, LLC, respectfully submits this application in support of the

Debtor's request for temporary, preliminary, and permanent injunctive relief (the "Application");

and which states as follows:

## JURISDICTION

1.      The Court has jurisdiction over this adversary proceeding pursuant to 28 *U.S.C.* §§

157(b), 1334(b), 2201, and other applicable provisions of federal law.

2.      This adversary proceeding is a core proceeding as that term is defined in 28 *U.S.C.*

§ 157(b)(2)(A), (C), (E), (H), and (O).

3.      Venue of this adversary proceeding in this district is proper under 28 *U.S.C.* §1409.

## BACKGROUND

4.      The Debtor respectfully refers to the allegations set forth in the verified adversary

complaint, filed contemporaneously herewith, and incorporates those allegations as if set forth at

length herein.

## INJUNCTIVE RELIEF SOUGHT

5.      By this Application, the Debtor requests the Court immediately restrain defendant

Aetna Life Insurance Company and its affiliated entities (collectively "Aetna") from terminating

the Master Services Agreement ("MSA")[1] between the Debtor and Aetna pursuant to Section

17(B)(2) of the MSA, and ordering Aetna to continue its practice of adjudicating medical Benefit

Claims while coordinating and consulting with the Debtor in good faith regarding reimbursement

of such claims under the MSA.

## RIGHT TO RELIEF

6.      *Fed. R. Civ. P.* 65, made applicable in adversary proceedings pursuant to *Fed. R.*

*Bankr. P.* 7065 and District of New Jersey Local Bankruptcy Rule 7065-1, require an adversary

---

[1] Unless otherwise specified, all capitalized terms not defined herein shall have the meaning attributed to them in the Verified Adversary Complaint filed contemporaneously herewith.

2

proceeding to support an application for an order to show cause.

7. Although an injunction is considered an extraordinary remedy, the grant or denial rests within the discretion of the Court. *In re G-I Holdings, Inc.*, 327 B.R. 730, 750 (Bankr. D.N.J. 2005); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merk Consumer Parms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).

8. The moving party has the burden of convincing the court that the following factors favor granting the relief: (i) the likelihood that the moving party will succeed on the merits; (ii) the extent to which the moving party will suffer irreparable harm without injunctive relief; (iii) the extent to which the nonmoving party will suffer irreparable harm if the injunction is granted; and (iv) the public interest. *Rogers v. Corbett*, 468 F.3d 188, 192 (3d Cir. 2006); *Novartis*, 290 F.3d at 586.

9. Plaintiffs need only demonstrate a "reasonable probability of eventual success in the litigation. *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 403 (D.N.J. 2008) (finding that it is not necessary for the moving party's right to relief to be "wholly without doubt," but "rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits.") (quotation omitted).

10. Here, the Debtor satisfies all of the requirements for the issuance of a temporary, preliminary, and permanent injunction against Aetna based on Aetna's breach of the implied covenant of good faith and fair dealing.

### Likelihood of Success and Irreparable Harm

11. The implied covenant of good faith and fair dealing ("implied covenant") exists in every contract under New Jersey law. See Cargill Global Trading v. Applied Development Co., 706 F.Supp.2d 563, 579 (D.N.J. 2013) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18*

*Shopping Ctr. Assoc.*, 182 N.J. 210, 224 (2005)).

12. Such a claim "is grounded on the fundamental principle that in every contract there is an implied covenant that neither party shall commit any act which shall destroy or injure the rights of the other party to enjoy the fruits of the contract." *Barrows v. Chase Manhattan Mortg. Corp.*, 456 F.Supp.2d 347, 365-66 (D.N.J.2006) (holding that a contract allowing one party to collect attorneys' fees from the other may contain an implied duty to ensure that the attorneys' fees collected were proper and not excessive).

13. In order to establish a prima facie claim for breach of the implied covenant, a plaintiff must establish that: (1) some type of contract existed between the parties; (2) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (3) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm. *See* Model Jury Charge (Civil) 4.10J "Implied Terms – Covenant of Good Faith and Fair Dealing" (December 2011); *see also Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997).

14. Here, the MSA, both by itself and as amended by the Aetna Order permitting assumption of the MSA by the parties, is a valid and enforceable agreement between the Debtor and Aetna.

15. As alleged in the Verified Adversary Complaint, Aetna has acted in bad faith with the purpose of depriving the Debtor of the benefit of the MSA.

16. Causes of action based on a violation of the covenant of good faith and fair dealing arise in three situations: (1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext

for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance. *Barrows*, 456 F.Supp.2d at 365 (citing *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 257 (App. Div. 2002)).

17. Establishment of any one situation is sufficient to show Debtor's likelihood of success. However, all three are present in this case.

18. **First**, Regarding the first type of violation of the implied covenant, the covenant acts in such instances to include terms "the parties must have intended . . . because they are necessary to give business efficacy" to the contract. *New Jersey Bank v. Palladino*, 77 N.J. 33, 46 (1978); *see Bak-A-Lum Corp. of America v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129-30 (1976) (finding that 20 months' notice prior to manufacturer's termination of an exclusive distribution agreement with regional distributor was reasonable in the absence of an express termination notice provision); *Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171, 187 (1981) (holding that when "one party to a contract possesses a monopoly on the information necessary for the monitoring of the agreement, it follows, as a matter of logic drawn from the subject matter of the contract itself and sound public policy, that access to that information in a reasonable form must be imputed into the contract by a court to ensure the performance of the parties' critical understandings.").

19. Here, Aetna serves as the third-party administrator for the Debtor, handling medical and prescription claims administration, claims processing, processing of checks and other payments, benefit plan administration, and HIPAA administration. Aetna also provides all reporting with regard to claims presented, facilitates payment of claims, deals with all providers and covered individuals, and secures and maintains pricing contracts with health care providers

5

and passes those "provider discounts" to the Debtor.

20. The Debtor does not have the capacity or resources to perform the services that Aetna provides on the scale at which Aetna provides them, and the Debtor's actuaries and other professionals rely on the discounts obtained by Aetna (pursuant to contracts obtained by Aetna and not shared with the Debtor) for setting rates based on estimates of projected liabilities.

21. Accordingly, there are several terms and conditions not expressly set forth in the MSA, but that are consistent with the parties' contractual expectations in order to give business efficacy to the MSA, or that otherwise must be imputed into the MSA.

22. Here, Aetna previously exercised its discretion under the MSA and the Order to adjudicate certain Benefit Claims as "pending" and defer ultimate adjudication of such claims.

23. However, although Aetna's decision to place medical claims in pending status meant that Aetna did not issue Funding Requests to APEMT related to those claims, it also resulted in a highly inflated and grossly inaccurate valuation of the pending claims due to Aetna's refusal to identify or remove duplicate claims and refusal to apply provider discounts.

24. Although not expressly set forth in the MSA or the Order, APEMT requested that Aetna: (i) provide information regarding provider discounts as they may be applied to any pending or outstanding Benefit Claims; (ii) provide information regarding duplicative pending or outstanding Benefit Claims; and (iii) process pending or outstanding Benefit Claims according to their size and in such a way as to permit APEMT to utilize its stop-loss insurance. APEMT has also requested that Aetna coordinate and consult with APEMT regarding the payment of Benefit Claims, including the possibility that such claims could be paid in batches commensurate with APEMT's ability to fund Funding Requests from Aetna. Aetna had and continues to have the discretion under the MSA and Order to comply with each of these requests, all of which are

consistent with the contractual expectations of the parties.

25.     However, as of September 7, 2021, and as a result of APEMT rejection of Aetna's unfair and coercive proposed changes to APEMT's proposed Subchapter V Plan, Aetna has refused to continue pending claims, but has also unfairly refused each of the Debtor's additional requests regarding pending or outstanding Benefit Claims.

26.     **Second**, regarding the next type of violation of the implied covenant, although the New Jersey Supreme Court has consistently held that the implied covenant cannot override an express term of a contract, *see Sons of Thunder*, 148 N.J. at 419, it does require that a contracting party act in good faith when exercising either discretion in performing its contractual obligations, *see Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001), or its right to terminate, *see Bak-A-Lum*, 69 N.J. at 129-30.

27.     Here there is substantial evidence that Aetna has not acted in good faith when exercising discretion in performing its duties.

28.     Specifically, Aetna's above-described refusal to continue pending claims in conjunction with its unfair refusal of each of the Debtor's additional requests for information about the processing of pending or outstanding Benefit Claims represents bad faith conduct, especially because Aetna did not engage in this conduct until after APEMT rejected Aetna's unfair and coercive proposed changes to APEMT's proposed Subchapter V Plan.

29.     Further, and upon information and belief, Aetna is engaging in the above-described conduct, and especially its adjudication of pending claims while also refusing to provide information about the processing of such claims, in order to create a pretextual reason to exercise its right to terminate the MSA under Section 17(B)(2) of same.  Indeed, Section 17(B)(2) of the MSA expressly requires that any termination by Aetna pursuant to that section be done in good

faith.

30.   **Third,** the final situation implicating a breach of the implied covenant is one where a party exercising its discretionary rights under the contract uses that discretionary authority "arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract."  *Wilson*, 168 N.J. at 251.   This scenario requires the establishment of "bad motive or intention[.]"  *Id.*

31.   Here, bad motive or malicious intent can be established by the sequence of events, beginning with Aetna's exercise of contractual discretion to adjudicate medical claims as "pending", followed by Aetna's failed attempt to impose unfair and one-sided terms upon APEMT in its proposed Subchapter V Plan, and concluding with Aetna's refusal to continue pending claims and refusal to coordinate with APEMT regarding payment and reimbursement of same, and refusal to comply with any of the Debtor's additional reasonable requests for information about pending or outstanding Benefit Claims.

32.   Lastly, Aetna's conduct will cause the plaintiff to suffer injury, damage, loss or harm.

33.   Specifically, if Aetna is permitted to continue its course of conduct and terminate the MSA, the Debtor would have no access to the provider discounts negotiated by Aetna, and no way to process the millions of dollars in pending or outstanding Benefit Claims already submitted to Aetna.

34.   Even if the Debtor was able to secure another entity to process pending or outstanding Benefit Claims, it would have no access to important processing details such as covered individuals' deductibles or available co-insurance, or the claim edits or cost controls that typically stop a claim from being paid erroneously.

35. The negative consequences for the Debtor include an inability to accurate assess its membership.

36. The negative consequences for health care providers and, ultimately, the Debtor's covered individuals – *who still rely on Aetna and APEMT to process and fund claims for life-saving prescription medications,* which are not implicated by Aetna's above-described decisions regarding medical claims, but which *would be implicated by Aetna's termination of the MSA –* could be even more dire. The providers would be left without payment for services, and be required to secure payment from the covered members. The members would be left to fend for themselves against providers seeking payment directly and without any obligation to extend the negotiated provider discounts.

37. Based on the foregoing statements, there is a high likelihood that the Debtor will succeed on the merits of it claim for breach of the implied covenant.

### Balance of Hardships

38. Bankruptcy Courts in New Jersey determine whether or not to grant preliminary injunctive relief after considering the extent to which the moving party will suffer irreparable harm without injunctive relief and the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued. *Novartis*, 290 F.3d at 586.

39. Courts recognize a prominent goal of maintaining the status quo. *Kos Pharma., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004) ("…defined as the last peaceable, noncontested status of the parties.").

40. Courts also recognize that irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it. *Kos Pharma.*, 369 F.3d at 727; *MNI Mgmt.*, 542 F. Supp. 2d 389, 403 (D.N.J. 2008) (holding that irreparable harm can include loss of trade).

41.   Here, Aetna's prospective termination of the MSA would eliminate the apparatus currently in place for processing medical and prescription claims, applying discounts, applying secondary insurance, and implementing cost controls, among other negative consequences. This would make it near impossible to pass on the provider discounts to the thousands of essential workers in New Jersey who are covered individuals under the Debtor's plans.  The covered individuals would be left to fend for themselves against the providers whose services were sought under the expectation that Aetna would honor its agreement with the Debtor in good faith.

42.   Aetna's prospective termination would also  irreparably affect the Debtor's ability to project an appropriate assessment on the members to cover the cost of the claims since the Debtor would be unable to determine the validity of the claims, making the administration of the bankruptcy case exponentially more expensive and difficult, if not impossible.

43.   The last peaceable, noncontested time for the parties could not have existed once Aetna refused to coordinate with APEMT regarding payment and reimbursement of same.

44.   By contrast, should the Court grant the injunctive relief sought herein, Aetna will suffers no risk of irreparable harm.  The only negative consequence that could possibly accrue to Aetna is that it may not be able to demand reimbursement from the Debtor for Benefit Claims as quickly as it would prefer to.

### Public Interest

45.   Finally, the Court must consider the public interest in determining whether to grant preliminary injunctive relief.  *Novartis*, 290 F.3d at 586.

46.   As a practical matter, however, where a plaintiff demonstrates a likelihood of success and irreparable injury, courts invariably find support in the public interest.  *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 52 F.3d 1421, 1427 N.8 (3d Cir. 1994).

47.    Here, the public interest favors granting the preliminary injunctive relief because public interest is served generally by preventing parties from undermining the rights of other contracting parties.

48.    However, the specific public interest in this particular case – i.e., the public's interest in preventing Aetna from terminating the MSA and jeopardizing the efficacy and cost-accessibility of health insurance for thousands of New Jersey's essential workers during an extended and ongoing global COVID-19 pandemic – cannot be understated or counterbalanced.

**WHEREFORE** the Debtor requests the Court immediately restrain Aetna from terminating the MSA pursuant to Section 17(B)(2) of the MSA, and by ordering Aetna to continue its practice of adjudicating medical Benefit Claims while coordinating and consulting with APEMT in good faith regarding reimbursement of such claims, and grant such other relief as the Court may deem just and proper.

**GENOVA BURNS, LLC**
*Counsel for Affiliated Physicians Employers Master Trust*

By: _____

DANIEL M. STOLZ

DATED:  September 16, 2021

11